1

2

3

4

5

6

7

8                        **UNITED STATES DISTRICT COURT**

9                        **CENTRAL DISTRICT OF CALIFORNIA**

10

11   AUDREY P. WALTERS,              )   NO. CV 10-0904 SS
                                     )
12                   Plaintiff,      )
                                     )
13            v.                     )
                                     )   **MEMORANDUM DECISION AND ORDER**
14   MICHAEL J. ASTRUE,              )
     Commissioner of the Social      )
15   Security Administration,        )
                                     )
16                   Defendant.      )
     _____)

17

18                                **I.**

19                             **INTRODUCTION**

20

21        Audrey Walters ("Plaintiff") brings this action seeking to reverse

22   and remand the decision of the Commissioner of the Social Security

23   Administration (the "Commissioner" or the "Agency") denying her

24   application for Supplemental Security Income ("SSI") benefits.  The

25   parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction

26   of the undersigned United States Magistrate Judge.  For the reasons

27   stated below, the decision of the Agency is AFFIRMED.

28

## II.

### PROCEDURAL HISTORY

On August 30, 2001, Plaintiff filed for SSI benefits pursuant to Title XVI of the Social Security Act. (Administrative Record ("AR") 43, 45). Plaintiff alleged an onset disability date of June 10, 1993, (AR 43), due to hepatitis B and C. (AR 51). The Agency denied Plaintiff's application on December 17, 2001. (AR 33). Plaintiff requested the Agency reconsider her application. (AR 37). The Agency granted Plaintiff's request, but nonetheless affirmed the Commissioner's original decision. (AR 38). Plaintiff requested a Hearing By Administrative Law Judge ("ALJ") on April 1, 2002. (AR 42). ALJ John C. Tobin presided over the hearing (the "2002 Hearing") on September 9, 2002. (AR 243). On December 26, 2002, the ALJ denied Plaintiff's request for benefits in a written decision. (AR 19).

Plaintiff requested review of the ALJ's decision. (See AR 9-10). The Appeals Council denied that request on January 14, 2004. (AR 5). Plaintiff filed a civil action that resulted in a stipulation to remand the case back to the Commissioner. (AR 315). The stipulated remand required the ALJ to re-evaluate Plaintiff's subjective complaints and medical evidence in light of all evidence in the record. (AR 313-14). On December 6, 2004, the Appeals Council vacated the ALJ's 2002 decision and ordered a new hearing pursuant to the Court's order. (AR 318). That hearing (the "2005 Hearing") was held on February 16, 2005. (AR 462).

\\

1   On May 24, 2005, the ALJ again denied Plaintiff's request for
2   benefits. (AR 305). Pursuant to written exceptions filed on June 20,
3   2005[1], (See AR 308), Plaintiff again requested the Agency to review the
4   ALJ's decision on June 23, 2005. (AR 329). On January 12, 2006, the
5   Appeals Council remanded the case to a new ALJ to further consider
6   Plaintiff's physical condition, qualifying work history, and residual
7   functional capacity[2] ("RFC"). (AR 308-09). ALJ Lawrence D. Wheeler
8   scheduled a third hearing for March 28, 2007, (the "2007 Hearing"), (AR
9   336, 339), and a supplemental hearing on June 17, 2008 (the "2008
10  Hearing"). (AR 279). On July 24, 2008, ALJ Wheeler held that Plaintiff
11  was not eligible for benefits. (AR 288). On August 11, 2008, Plaintiff
12  filed written exceptions to the ALJ's decision that challenged the ALJ's
13  rejection of evidence regarding Plaintiff's mental impairments. (AR
14  272, 274). On December 17, 2009, the Agency denied Plaintiff's request
15  and held that the ALJ's decision was the final decision of the
16  Commissioner. (AR 270). Plaintiff filed the instant action on February
17  11, 2010.
18  \\
19  \\
20  \\
21  \\

---

23  [1]   The June 20, 2005 written exceptions are not included in the
24  administrative record. Based on the Appeals Council's order, (AR 308-
25  09), the Court construes them to challenge the ALJ's RFC determination
    and to ask that an eye-ulcer that developed after the 2001 hearing be
26  considered in the ALJ's analysis of Plaintiff's physical limitations.

27  [2]   Residual functional capacity is "the most [one] can still do
28  despite [one's] limitations" and represents an assessment "based on all
    the relevant evidence in [one's] case record." 20 C.F.R. §§
    404.1545(a), 416.945(a).

-3-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.

### FACTUAL BACKGROUND

Plaintiff was born on December 24, 1956. (AR 43). Plaintiff completed the eleventh grade, (See AR 246), and has no special job, trade, or vocational training. (AR 57). Plaintiff alleged that hepatitis B and C limited her ability to work. (AR 51). Specifically, Plaintiff claimed she was "always in pain" and suffered from chronic vomiting and diarrhea. (AR 51). Plaintiff claimed her illness began on August 7, 1978, (AR 51), but that it first rendered her unable to work on June 10, 1993. (AR 43). However, when Plaintiff completed a Disability Report on August 30, 2001, she stated that she was currently working. (AR 51, 59). Plaintiff reported making six hundred dollars a month working part-time as a telemarketer at World Tech Computers. (AR 44, 246). Further, Plaintiff reported working in office sales from August of 1978 to August of 2001, (AR 52), and as a bartender. (AR 262). Plaintiff admitted to a history of cocaine use and has been incarcerated six times as a result. She was arrested approximately five months prior to her 2001 psychiatric evaluation and was on probation at that time. (See AR 140, 496).

### A.   **Plaintiff's Subjective Complaints**

On August 30, 2001, Plaintiff completed an application for SSI benefits and a Disability Report. (AR 43, 45, 50, 59). Plaintiff stated she could not work because she suffered from Hepatitis B and C and was "always in pain, vomiting, diereta [sic]." (AR 51). Further, Plaintiff stated her work hours were reduced "because of always being

-4-

tired." (AR 51). On November 11, 2001, Plaintiff completed a Daily Activities Questionnaire. (AR 60, 65). Plaintiff again claimed Hepatitis C precluded her from working because it made her "tire[d] all the time and [caused her] a lot of pain." (AR 64). However, Plaintiff admitted daily living activities consisting of "shopping, cleaning, visiting, [and] watching TV," (AR 60), as well as cooking, laundry, household maintenance, and ironing. (See AR 61). Further, Plaintiff denied needing assistance to complete these household tasks. (See AR 61). Plaintiff also claimed she had difficulty sleeping "due to breathing problems" but denied taking medication to sleep. (AR 60). On January 14, 2002, Plaintiff completed a Reconsideration Disability Report and claimed she suffered from asthma. (AR 72, 75). Plaintiff stated that "with flu-like problems all the time and asthma, it's hard to get going." Six months later, Plaintiff claimed that she was "blind in [her] left eye." (AR 29).

At the 2002 Hearing, Plaintiff admitted that she "used to smoke," and stated she stopped using cocaine "[a] year and a half ago." (AR 250, 254-55). Plaintiff claimed that she had suffered from Hepatitis C "for over 15 years" and that it made her tired, vomit, and gave her diarrhea. (AR 249). Plaintiff also claimed she suffered from asthma, (AR 249-50), seizures, (AR 249), and a corneal ulcer in her left eye. (AR 251). Plaintiff reported taking Singular and Proventil to treat her asthma, (AR 250), and Dilantin to treat her seizures. (AR 248, 260). However, Plaintiff stated she was not being treated for Hepatitis C because her doctors told her "that the medication they give you for Hepatitis C will cause more seizures." (AR 249). Plaintiff testified that she stopped working because she was "too tired all the time." (AR

-5-

247).  Plaintiff claimed that her breathing problems, poor eye-sight, and general fatigue prevented her from working at her telemarketing job for eight hours a day.  (See AR 256-57) ("[I]'m always tired.  I don't' feel good.  My body aches, the whole thing.  I just don't feel good.").  Plaintiff testified that she could only walk "half a block because [she] can't breathe."  (AR 259).  Further, Plaintiff claimed she had "trouble seeing the stairs" and that she was prone to "falling downstairs a lot." (AR 259).

At the 2005 Hearing, Plaintiff reported her "asthma [was] getting worse," and that she used an inhaler "maybe eight, nine times a day." (AR 468).  Plaintiff also claimed she suffered from asthma attacks, "six, seven, eight times a day" that would last for "three to four minutes."  (AR 477).  Plaintiff testified that she had to stop working because she would "run out of air in the middle of a sentence."  (AR 467).  However, Plaintiff admitted to smoking "like two cigarettes a day."  (AR 471).  Plaintiff again complained of Hepatitis C-related fatigue, vomiting, and diarrhea, (AR 472), and that, "[b]etween the breathing and the hepatitis, [she] didn't have any energy."  (AR 479).  Plaintiff testified that she could only sit for "[t]en, fifteen minutes" and that she could not "stand too long, five or ten minutes."  (AR 473-74).  Plaintiff further testified that she had to lie down a lot during the day and that lying down triggered choking fits.  (AR 474-75).  However, Plaintiff admitted not reporting these problems to her doctors, and stated, "maybe I should, huh?"  (AR 475).

At the 2007 Hearing, Plaintiff testified that she had asthma attacks "four or five times a day" but admitted she still smoked "two

-6-

cigarettes a day." (AR 498). Plaintiff reported improvement from an eye surgery she received in November of 2006, though she still "ha[d] trouble seeing up close." (AR 498). Plaintiff testified she had been suffering symptoms of depression for "[a]bout six months, seven months, eight months, somewhere around there." (AR 499). Plaintiff claimed the depression exacerbated her fatigue. (AR 499) ("I don't want to get up. I just want to just--I don't want to do anything. I'm just depressed."). However, Plaintiff has failed to seek any consistent treatment for her depression. (AR 500).

At the 2008 Hearing, Plaintiff testified that she had stopped smoking "about four or five months ago." (AR 512). Plaintiff testified that in December of 2007 she was hospitalized because she "had pneumonia [and] had a mass in [her] lungs" that was potentially cancerous. (AR 513-14). However, Plaintiff denied receiving chemotherapy or radiation treatments and claimed her doctors were "still doing tests." (AR 514). Further, Plaintiff admitted the tests were not conclusive. (See AR 515). Plaintiff also testified that she "can't walk on [her] foot" because she "just had foot surgery." (AR 516). However, Plaintiff admitted that prior to her foot surgery, she was able to "clean the house," "[g]o to the store for dinner, or just whatever [was] available for the day . . . ." (AR 516).

\\
\\
\\
\\
\\
\\

**B.   Plaintiff's Relevant Medical History**

On November 18, 1999, Plaintiff tested positive for Hepatitis C at the Northeast Valley Health Corporation Homeless Division.  (AR 372). On June 11, 2001, Plaintiff sought treatment at Northeast Valley for an "infection in both eyes."  (AR 235).  The attending doctor diagnosed Plaintiff with conjunctivitis and prescribed an ophthalmic solution. (AR 234).  On June 19, 2001, the Twin Towers Correctional Facility Laboratory issued a report stating Plaintiff tested positive for both Hepatitis B and C.  (AR 123).  On August 22, 2001, Plaintiff sought treatment at the Pacifica Hospital of the Valley emergency room for chills, cough, and congestion. (AR 93).  The attending doctor diagnosed Plaintiff with Bronchitis, (AR 97), and was prescribed Robitussin and Bioxin. (AR 98).  On September 25, 2001, Plaintiff began treatment at the Northeast Valley for "trouble breathing."  (AR 225).  Plaintiff reported smoking one pack of cigarettes per week, (AR 225), and that she had recently quit cocaine. (AR 226).  Plaintiff also reported suffering from Hepatitis B and C and that it caused vomiting and fatigue. (AR 225).  The attending doctor prescribed Atrovent and Albutenol. (AR 220).

On June 7, 2002, Plaintiff sought treatment at the Olive View UCLA Medical Center emergency room.  (AR 206).  The attending doctor diagnosed Plaintiff with a left corneal ulcer and prescribed Vicodin and Ciloxan eye drops. (AR 206, 210).  Subsequent attending doctors later diagnosed Plaintiff with HSV keratitis and prescribed Acyclovir.  (AR 188).  By August 9, 2002, Plaintiff reported that her eye was feeling better. (AR 183).  Plaintiff continued to seek treatment at Northeast Valley for various ailments between 2004 and 2006. (See AR 348, 354-55,

1  408).   Plaintiff sought treatment at the Kaiser Permanente emergency
2  room on April 2, 2006, (AR 423), for a "painful rash" and "mild left eye
3  pain." (AR 421).  The attending doctor reported Plaintiff was blind in
4  her left eye, (AR 422), and prescribed her Vicodin, Prednisone and
5  Acyclovir.   (AR 423).   Plaintiff returned to the Kaiser Permanente
6  emergency room on July 19, 2006 and complained of neck, shoulder, and
7  chest pain as well as "eyelid swelling."  (AR 415).   The attending
8  doctor prescribed Prednisone, Gentamycin eye drops, and Doxycycline and
9  instructed Plaintiff to continue using her inhalers.   (AR 418).
10 Plaintiff last sought treatment at Northeast Valley on September 26,
11 2006.   (AR 408).   The attending doctor diagnosed Plaintiff with a
12 cataract, "dry eye syndrome," and "HS keratitis."  (AR 409).   On
13 November 29, 2006, Plaintiff underwent cataract surgery at Olive View
14 Medical Center.  (AR 411).

15

16     On May 16, 2007, a student examined Plaintiff at West Valley Mental
17 Health Center.  (See AR 433, 439).  The student reported Plaintiff was
18 "disheveled" and "anxious" and had severely to moderately impaired
19 judgment and insight.  (AR 438).  The student diagnosed Plaintiff with
20 "major depressive disorder" and "cocaine dependency in remission."  (AR
21 439).  However, a medical doctor did not sign and adopt the student's
22 findings.  (See AR 439).  Plaintiff sought treatment at the Los Angeles
23 County Department of Mental Health on May 18, 2007 and was prescribed
24 Zoloft.  (AR 460-61).  Plaintiff reported "doing ok" at a follow up
25 appointment.  (AR 460).

26

27

28

On December 4, 2007, Plaintiff received a chest x-ray that revealed an abnormality in her right lung thought to be "fluid loculated in the minor fissure." (AR 458).  Plaintiff received a follow-up x-ray on January 3, 2008 that revealed and "increase" in the abnormality that was diagnosed as "either loculated fluid or mass." (AR 452).  However, Plaintiff also received a "biopsy of the chest" that revealed "no evidence of prior described 'mass'." (AR 454).  On May 10, 2008, Plaintiff received a third chest x-ray that revealed the abnormality was "not present." (AR 450).

**C.   Consultative Examinations**

**1. Internal Medicine Evaluations**

On September 28, 2001, Dr. Raymond Lee examined Plaintiff. (AR 134, 137).  Dr. Lee diagnosed Plaintiff with hepatitis B and C, but noted that there was "no evidence of end-stage liver disease." (AR 136).  Dr. Lee also diagnosed Plaintiff with emphysema, but noted that there was "no evidence of acute respiratory disease." (AR 136).  Dr. Lee reported that Plaintiff's "[r]espiratory auscultation reveals normal excursions without appreciable wheezing, rhonchi, or rubs." (AR 136).  Dr. Lee found that Plaintiff's "range of motion of all extremities appears normal" and that Plaintiff "moved about the room without becoming significantly short of breath . . . ." (AR 136).  Dr. Lee noted that Plaintiff smoked "one-half pack of cigarettes per day," had "a history of intravenous drug use," and that "[s]he snorted cocaine until six months ago." (AR 135).  Dr. Lee concluded that, "[b]ased upon

the physical examination and the history as obtained . . . [Plaintiff] currently ha[d] no impairment related physical limitations." (AR 136).

On June 14, 2006, Dr. Ursula E. Taylor examined Plaintiff. (AR 382, 387). Dr. Taylor found Plaintiff to be "friendly and cooperative" and "in no acute distress." (AR 383-84). Dr. Taylor reported Plaintiff had "a good range of motion without evidence of pain . . . ." (AR 384). Further, Dr. Taylor reported that Plaintiff's heart "rate and rhythm [were] regular," (AR 384), her "[m]uscle tone and mass appear[ed] normal," (AR 385), and that she could "walk without an assistive device." (AR 386). Dr. Taylor also reported Plaintiff's "[r]espiratory auscultation reveals normal excursions without appreciable wheezing, rhonchi, or rubs." (AR 384). Dr. Taylor noted that "the pulmonary function test was not consistent" with Plaintiff's claim that she suffered from asthma. (AR 386). Dr. Taylor also doubted Plaintiff's hepatitis-related disability claims. (See AR 386). Dr. Taylor stated, "[Plaintiff] does not appear significantly limited based on [the] possible history" of hepatitis. (AR 386). However, Dr. Taylor suggested that Plaintiff's "long-term IV drug abuse and cocain use" and "long-term smoking" explained her reported symptoms. (See AR 386).

**2. Psychiatric and Psychological Evaluations**

On November 19, 2001, Dr. Mehboob Ali Makhani examined Plaintiff. (AR 139, 143). Dr. Makhani found Plaintiff to be "well kept, well nourished, [and] in no apparent distress." (AR 141). Dr. Makhani reported that Plaintiff denied "suffer[ing] from any psychiatric problems" or a "depressed mood." (AR 139). Dr. Makhani stated that

-11-

1  Plaintiff admitted to cocaine abuse, (AR 140), and reported she was
2  "currently in remission for the past six months." (AR 142). Dr.
3  Makhani found Plaintiff "able to understand, retain, and follow basic
4  instructions." (AR 142). Dr. Makhani also found that Plaintiff had
5  "adequate self-care skills of bathing, dressing, eating, toileting, and
6  safety precautions." (AR 141). Dr. Makhani reported that Plaintiff
7  admitted to "shopping, cooking and cleaning." (AR 141). Dr. Makhani
8  reported that Plaintiff's social activities included "visiting friends
9  and relatives, going to movies . . . [and] shopping in a variety of
10 stores." (AR 140). Dr. Makhani concluded that Plaintiff, "should be
11 able to relate appropriately to [the] general public, coworkers and
12 supervisors." (AR 142). Additionally, Dr. Makhani found that Plaintiff
13 could "handle the stresses and demands of gainful employment within her
14 intellectual and physical limitations." (AR 142).

15

16     On December 6, 2001, Dr. Marina C. Vea assessed Dr. Makhani's
17 examination results and determined Plaintiff's mental RFC. (AR 160,
18 162). Dr. Vea found that Plaintiff was moderately limited in her
19 "ability to understand and remember detailed instructions" and her
20 "ability to carry out detailed instructions." (AR 160). However, Dr.
21 Vea found Plaintiff had no other significant mental limitations. (See
22 AR 160-61). Dr. Vea concluded that Plaintiff's understanding and memory
23 were "sufficient for short and simple tasks." (AR 161). Dr. Vea
24 further concluded that Plaintiff's concentration and persistence were
25 "sufficient for unskilled work" and that she could "adapt . . . to usual
26 changes in [the] work setting." (AR 161).
27 \\
28

On March 19, 2008, Dr. Stefanie Stolinsky examined Plaintiff. (AR 443, 449). Dr. Stolinsky reported that Plaintiff appeared to have "serious medical problems compounded by a long history of alcohol and cocaine use and abuse." (AR 446). Dr. Stolinsky diagnosed Plaintiff with "Substance Induced Mood disorder; Cocaine Abuse; RULE OUT: Mood Disorder Due to Lung Cancer diagnosis and other physical medical problems; RULE OUT: Borderline Personality Disorder." (AR 445-46). Dr. Stolinsky cited Plaintiff's "long history of drug and alcohol use and abuse" and "incarcerations in prison" to support her diagnosis. (See AR 443, 446, 448) ("The alcohol and cocaine use and abuse has led to several arrests and incarcerations. The claimant has probably become . . . depressed due to the effect of the substances on her brain.").

Dr. Stolinsky reported that Plaintiff's "[r]ecent and remote memory were adequate, but [her] attention span and concentration appeared impoverished." (AR 444). Dr. Stolinsky noted that Plaintiff "became very tired and [was] unable to continue" a test that measured mental functioning. (AR 445). Thus, Dr. Stolinsky found that Plaintiff "cannot concentrate or attend to simple or complex tasks" nor "participate in any activity for long periods of time." (AR 446). Dr. Stolinsky concluded that Plaintiff "does not have the energy or stamina to sustain a position for five days a week, forty hours a day." (AR 446).

\\
\\
\\
\\
\\

1  **D.  <u>Vocational Expert Testimony</u>**

2

3      Dr. June Hagen, a vocational expert ("VE"), testified at the 2002

4  Hearing.  (AR 261).  The VE described Plaintiff's telemarketing work as

5  "sedentary" and "semiskilled" and Plaintiff's bartending work as "light"

6  and "semiskilled."  (AR 264).  The VE testified that a person with

7  "limited education" and "irregular vision" who was capable of "medium

8  exertional work" could perform Plaintiff's past relevant work.  (<u>See</u> AR

9  264-65).  The VE further stated that Plaintiff could work as a

10  telemarketer but not a bartender even if her "fatigue and flu-like

11  symptoms" precluded working full-time.  (<u>See</u> AR 266).

12

13      Lynne Tracy, a VE, testified at the 2005 Hearing.  (AR 482).  The

14  ALJ characterized Plaintiff's limitations as "limited education,"

15  "monocular vision," and "light exertional level" work at the "sedentary

16  level."  (AR 486).  The VE testified that an individual with Plaintiff's

17  limitations "would still be able to perform the telemarketing job."  (AR

18  487).  The ALJ further limited Plaintiff to requiring "unscheduled

19  breaks . . . between six to seven a day" and "another set of breaks

20  three times a day for . . . unexpected restroom visits."  (AR 488).  The

21  Plaintiff's attorney added yet a further limitation requiring Plaintiff

22  to "lie down at will."  (AR 489).  The VE testified that if Plaintiff

23  required all of the limitations, she would be unable to work.  (<u>See</u> AR

24  489).  The VE noted, "[t]he lying down at will, obviously, in and of

25  itself is a problem."  (AR 489).

26

27      A VE did not testify at the 2007 Hearing.  (<u>See</u> AR 504-05).

28  However, Dr. Ronald Hatakeyama, a VE testified at the 2008 Hearing.  (AR

-14-

517).   The ALJ limited Plaintiff's work ability to "exertionally . . . light," work that avoids "moderate exposure to smoke, dust, fumes, [and] gasses," and requires "[n]o binocular vision."   (AR 519).   To accommodate Plaintiff's mental impairments, the ALJ further limited Plaintiff to "no public contact, and minimal pier [sic] contact, and simple one to three step tasks."  (AR 519).   The VE testified that Plaintiff could not work her past jobs based on the ALJ's limitations. (AR 519).  However, the VE testified that Plaintiff could work as "a label coder, which is doing assembly type work" or a "collator operator, which is in the clerical field."   (AR 519-20).

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[3] and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).   The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

---

[3]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows:

> (1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
>
> (2)  Is the claimant's impairment severe? If not, the claimant is found not disabled.  If so, proceed to step three.
>
> (3)  Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.
>
> (4)  Is the claimant capable of performing her past work?  If so, the claimant is found not disabled.  If not, proceed to step five.
>
> (5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

1     _Tackett_, 180 F.3d at 1098-99; _see also_ 20 C.F.R. §§ 404.1520(b)-

2     (g)(1), 416.920(b)-(g)(1); _Bustamante v. Massanari_, 262 F.3d 949, 953-54

3     (9th Cir. 2001) (citations omitted).

4

5         The claimant has the burden of proof at steps one through four, and

6     the Commissioner has the burden of proof at step five. _Bustamante_, 262

7     F.3d at 953-54.  If, at step four, the claimant meets his burden of

8     establishing an inability to perform past work, the Commissioner must

9     show that the claimant can perform some other work that exists in

10    "significant numbers" in the national economy, taking into account the

11    claimant's RFC, age, education, and work experience. _Tackett_, 180 F.3d

12    at 1098, 1100; _Reddick_, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1),

13    416.920(g)(1).  The Commissioner may do so by the testimony of a VE or

14    by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R.

15    Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").

16    _Osenbrock v. Apfel_, 240 F.3d 1157, 1162 (9th Cir. 2001).  When a

17    claimant has both exertional (strength-related) and nonexertional

18    limitations, the Grids are inapplicable and the ALJ must take the

19    testimony of a VE. _Moore v. Apfel_, 216 F.3d 864, 869 (9th Cir. 2000).

20

21                                   **V.**

22                          **THE ALJ'S DECISION**

23

24        On July 24, 2008, the ALJ issued a decision denying benefits. (AR

25    288).  The ALJ employed the five-step sequential evaluation process,

26    (_see_ AR 281, 286), and concluded that Plaintiff was not disabled. (AR

27    287).  At the first step, the ALJ held Plaintiff had not engaged in

28    substantial gainful activity since applying for benefits. (AR 281).

                                    -17-

1    Next, the ALJ found Plaintiff's hepatitis, asthma, and visual impairment
2    qualified as severe impairments.  (AR 281).  At step three, however, the
3    ALJ found the severe impairments at step two did not meet or medically
4    equal a listed impairment.  (AR 281).

5

6        At step four, the ALJ held that Plaintiff was capable of working
7    as a telemarketer despite her impairments.  (AR 286).  Specifically, the
8    ALJ held that "the cumulative evidence . . . [did] not establish a
9    disabling persistence and intensity of [Plaintiff's] symptoms"
10   sufficient to preclude work.  (AR 282).  Pursuant to the Appeals
11   Council's order, the ALJ determined that Plaintiff's work as a
12   "telemarketer [was] past relevant work," (AR 281), that Plaintiff was
13   capable of performing.  (AR 286).  The ALJ reasoned that Plaintiff
14   "worked long enough [as a telemarketer] to learn average performance
15   from that period."  (AR 281).  The ALJ noted that though Plaintiff's
16   chief complaints were fatigue and shortness of breath, "neither appears
17   to have stymied her from engaging in a wide range of activities."  (AR
18   283).  The ALJ cited Plaintiff's admission of "shopping, cleaning,
19   visiting and watching television" to support his holding.  (AR 282)
20   (citing AR 60-61).  The ALJ also cited Plaintiff's denial of "problems
21   maintaining her personal care" and "independently completing all
22   household chores."  (AR 282) (citing AR 60).

23

24       The ALJ addressed Plaintiff's other physical limitations as well.
25   The ALJ held that there was no "durationally significant period in which
26   the claimant was precluded from performing jobs requiring only monocular
27   vision."  (AR 284).  The ALJ noted that Plaintiff's reported seizures
28

-18-

1  were "very infrequent" and "would not change the outcome" of his

2  decision.  (AR 284).

3

4      The ALJ found that Plaintiff's alleged depression did not

5  significantly limit her ability to work.  (AR 285).  The ALJ noted that

6  Plaintiff "did not allege a mental basis for 'disability'" on her 2001

7  application.  (AR 285).  Further, the ALJ stated that Plaintiff

8  consistently denied "any psychiatric problems" and did not "claim to

9  have any specific functional deficit due to mental health," until 2007.

10  (See AR 285).  The ALJ held that there was "little probative value and

11  even less durationally significant value" in the data resulting from

12  those initial complaints.  (AR 285).  The ALJ determined that the

13  results from Plaintiff's 2008 psychological evaluation were

14  "inconsistent with the longitudinal history" and "[Plaintiff's] daily

15  independent activities."  (AR 285-86).  The ALJ concluded Plaintiff had

16  "no 'severe' mental impairments."  (AR 286).

17

18      The ALJ suggested "that drug abuse and legal problems have played

19  a role in [Plaintiff's] inconsistent employment history as much as any

20  impairments that are potentially compensable under the Act."  (AR 284).

21  The ALJ thus assessed Plaintiff's RFC and determined Plaintiff was

22  capable of "light work."  (AR 281).  The ALJ held Plaintiff "must avoid

23  moderate (and greater) exposure to smoke, dusts, fumes and gasses; and

24  can only perform work that requires monocular vision."  (AR 281).  The

25  ALJ further limited Plaintiff to "no public contact, minimal peer

26  contact [and] simple 1-3 step tasks."  (AR 282).  However, the ALJ noted

27  that Plaintiff "could perform the work on a 40-hour a week schedule."

28  (AR 286).  Finally, at step five, the ALJ concluded that Plaintiff could

work as a label coder or collator operator based on Plaintiff's RFC and the VE's testimony.   (AR 286).   Accordingly, the ALJ found that Plaintiff was not disabled at any time through the date of the decision. (AR 287).

## VI.
### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.   The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720.   It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." (Id.).   To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).   If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21.

**VII.**

**DISCUSSION**

**The ALJ Properly Found That Plaintiff Does Not Suffer**
**From A Severe Mental Impairment**

Plaintiff argues that the ALJ's conclusion that Plaintiff's mental impairment was not severe was error. (Plaintiff's Complaint Brief ("Compl. Br.") at 2). Specifically, Plaintiff contends that the ALJ erroneously rejected the opinion of Dr. Stephanie Stolinsky, one of two consultative examiners who assessed Plaintiff's mental capacity. (See Plaintiff's Reply Brief ("Reply Br.") at 2). Plaintiff asserts the ALJ improperly relied on an outdated medical evaluation written by consultative examiner Dr. Mehboob Ali Makahni. (Compl. Br. at 6). Plaintiff maintains that Dr. Stolinsky's report should be given more weight than Dr. Makahni's and, thus, the ALJ's decision should be remanded for further administrative proceedings. (Id. at 7). This Court disagrees.

By its own terms, the evaluation at step two is a de minimis test intended to weed out the most minor of impairments. See Bowen v. Yuckert, 482 U.S. 137, 153-154, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987); Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2005) (stating that the step two inquiry is a de minimis screening device to dispose of groundless claims) (quoting Smolen, 80 F.3d at 1290). An impairment is not severe only if the evidence establishes "a slight abnormality that has only a minimal effect on an individual's ability

-21-

to work."   Smolen, 80 F.3d at 1290 (internal quotations and citations omitted).

Plaintiff's medical history supports the ALJ's determination that Plaintiff does not suffer from a severe mental impairment.   The record indicates that Plaintiff has received substantial medical treatment for various physical problems over a ten year period.   However, the record is void of any significant treatment for mental health problems.   The record indicates that Plaintiff tested positive for Hepatitis C as early as November 18, 1999.   (AR 372).   Further, the record indicates extensive medical treatment for Plaintiff's left eye that includes diagnoses of HSV keratitis, (AR 188), and blindness, (AR 422), as well as cataract surgery.   (AR 411).   The record also indicates Plaintiff has been consistently treated for asthma.   (See AR 220, 225, 335, 348).

Conversely, there are no records indicating significant mental health treatment.   A mental health evaluation was performed by Dr. Makhani at the request of the Agency as part of Plaintiff's disability evaluation. (AR 139, 143).   That evaluation was performed on November 19, 2001.   (AR 139).   Notably, Plaintiff denied suffering from "any psychiatric problems" or "a depressed mood."   (AR 139).   Dr. Makhani found Plaintiff to be in "no apparent distress."   (AR 141).   Dr. Makhani concluded that Plaintiff "should be able to handle the stresses and demands of gainful employment within her intellectual and physical limitations."   (AR 142).   The record indicates Plaintiff received nominal mental health treatment in 2007, long after her first application for benefits.

Again at the request of the agency, Dr. Stephanie Stolinsky, a clinical psychologist, examined Plaintiff on April 3, 2008.[4]  (See AR 433, 439, 443, 446, 460-61).  Dr. Stolinsky found Plaintiff to have "serious medical problems compounded by a long history of alcohol and cocaine use and abuse."  (AR 446).  Dr. Stolinsky diagnosed Plaintiff with "substance induced mood disorder" and noted Plaintiff could not "concentrate or attend to simple or complex tasks."  (AR 445-46). However, Dr. Stolinsky's evaluation coincided with six months of testing Plaintiff received to determine whether an abnormality in her right lung was cancerous.  (See AR 450, 452, 455, 458).  Indeed, Dr. Stolinsky noted that Plaintiff "seemed to perseverate on her physical health." (AR 444).

Moreover, Plaintiff's own subjective complaints support the ALJ's determination that Plaintiff did not suffer a severe mental impairment. Plaintiff maintained consistent, specific complaints regarding her hepatitis, eye problems, and asthma with both her doctors and the Agency.  (See AR 29, 51, 72, 249-51, 467-68, 471-72).  However, Plaintiff's original application failed to mention any mental impairments (AR 51) and there is little evidence in the record of mental impairments until Plaintiff testified at the 2007 Hearing.  (AR 499). Plaintiff claimed she had suffered from symptoms of depression for "[a]bout six months, seven months, eight moths, somewhere around there."

_____

[4]  At the 2007 Hearing, Plaintiff testified she discussed her symptoms of depression and received a prescription for Zoloft at North East Valley.  (AR 499).  However, these medical records are not included in the record.  Further, the record indicates attending doctors at the Los Angeles County Department of Mental Health prescribed Plaintiff Zoloft on May 18, 2007 and on December 14, 2007, Plaintiff reported "doing ok."  (AR 460-61).

-23-

1  (AR 499).  However, Plaintiff could not clearly articulate the effect
2  her alleged depression had on her daily activities.  (See AR 499).
3  Plaintiff only stated: "I don't want to get up.  I just want to just—I
4  don't want to do anything.  I'm just depressed."  (AR 499).

6      Plaintiff fails to provide any credible evidence suggesting that
7  her mental impairments, to the extent they exist, result in anything
8  more than a slight abnormality.  Plaintiff merely stated at the 2007
9  Hearing that she suffered from depression and that it made her not want
10 to "get up" or "do anything."  (AR 499).  However, Plaintiff admitted
11 she did not seek treatment at that time.  (AR 500).  Moreover, at the
12 2008 Hearing, Plaintiff admitted to being able to "clean the house," "go
13 to the store for dinner, or just whatever is available for the day."
14 (AR 516).  This admission is consistent with the daily activities of
15 "shopping, cleaning, visiting, [and] watching TV" that Plaintiff
16 reported on her 2001 Daily Activities Questionnaire.  (AR 60).  These
17 activities are consistent with a finding that Plaintiff does not suffer
18 from a severe mental impairment.  Thus, Plaintiff has not met her burden
19 of proof on this issue.  See Bray v. Comm'r of Soc. Sec. Admin., 554
20 F.3d 1219, 1222 (9th Cir. 2009) ("The burden of proof is on the claimant
21 at steps one through four . . . .").

23     The ALJ properly relied upon Dr. Makhani's opinion in evaluating
24 Plaintiff's mental impairment.  The ALJ is not bound by an expert
25 medical opinion on the ultimate question of disability.  Tommasetti v.
26 Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008).  However, the ALJ must
27 provide specific and legitimate reasons for rejecting medical opinions.
28 See id.  Ultimately, "the ALJ is the final arbiter with respect to

resolving ambiguities in the medical evidence." Id.  Here, the ALJ found Dr. Makhani's report consistent with Plaintiff's medical history. (See AR 285).  The ALJ noted that Plaintiff "denied any psychiatric problems" during Dr. Makhani's examination, (AR 285) (citing AR 139), and that Dr. Makhani "reported a normal mental status examination." (AR 285).  The ALJ questioned the absence of substantial mental health complaints, examinations and treatment between Dr. Makhani's examination and Plaintiff's subjective complaints at the 2007 Hearing.  (See AR 285).  The ALJ stated "[t]here is essentially no evidence in the next several years related to emotional health . . . ."  (AR 285).

Moreover, the ALJ found Dr. Stolinsky's analysis of Plaintiff's mental condition "inconsistent with the longitudinal history."  (AR 285).  The ALJ reasoned that Dr. Stolinsky's determination that Plaintiff could not "concentrate on even simple tasks" did not correspond with Plaintiff's self-reported daily activities.  (AR 286). The ALJ explained that these activities suggested that "[Plaintiff's] energy level is not compromised so as to preclude a regular work schedule."  (AR 286).  The ALJ suggested that Plaintiff's lack of concentration was at least partially due to concerns over her physical health.  (AR 286).  Furthermore, the ALJ dismissed Plaintiff's treatment at West Valley Mental Health Center as "essentially . . . a form with circling of various signs or symptoms as present, but no quantification."  (AR 285).  The ALJ noted that "[t]he form [was] not signed by a M.D. or Ph.D." and in subsequent examinations, Plaintiff reported "doing well."  (AR 285, 460).  Thus, the ALJ provided the requisite "specific and legitimate reasons" that justified his rejection of Dr. Stolinsky's opinion.  Tommasetti, 533 F.3d at 1041 (holding the

-25-

1  rejection of a medical opinion was proper where the ALJ discussed in
2  detail how the opinion was inconsistent with the plaintiff's medical
3  history).

4

5     The ALJ assessed Plaintiff's RFC and, though he found "no severe
6  mental impairments," he nonetheless provided for mental limitations
7  "[b]ased on the cumulative evidence." (AR 286). The ALJ precluded
8  Plaintiff from "public contact, from more than minimal peer contact" and
9  further limited plaintiff to "simple 1-3 tasks." (AR 286). Thus,
10 assuming arguendo that the ALJ erred in finding no severe mental
11 impairment, any error was harmless because the ALJ incorporated
12 appropriate mental limitations into his RFC finding. See Carmickle v.
13 Comm'r, 533 F.3d 1155, 1162 (9th Cir. 2008) ("So long as there remains
14 'substantial evidence supporting the ALJ's conclusions' and the error
15 'does not negate the validity of the ALJ's ultimate conclusion,' such
16 is deemed harmless and does not warrant reversal)(quoting Batson v.
17 Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004)); Burch
18 v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ
19 will not be reversed for errors that are harmless.").
20 \\
21 \\
22 \\
23 \\
24 \\
25 \\
26 \\
27 \\
28

# VIII.

## CONCLUSION

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[5] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: November  24, 2010                    /S/

_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

---

[5]  This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."